**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 14-cr-00183-CMA

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.  TERRELL LAYNE SMITH,
    aka "Swiss,"

    Defendant.

---

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
SENTENCING MEMORANDUM**

---

The United States of America ("the government"), by John F. Walsh, United States Attorney for the District of Colorado, and Alecia L. Riewerts, Assistant United States Attorney, hereby responds to the defendant's Sentencing Statement [#96] ("Defendant's Sentencing Statement"). The government intends to seek a sentence of 188 months imprisonment, at the high end of the advisory sentencing guideline range as computed by the parties and at the low end of the advisory sentencing guideline range as calculated by U.S. Probation, which is a fair and just sentence and takes into consideration all of the circumstances of this case, including the factors delineated in 18 U.S.C. § 3553(a).

    **I.  THE UNITED STATES SENTENCING GUIDELINES**

The United States Sentencing Guidelines are advisory, but they remain "the starting point and the initial benchmark" in sentencing. *Gall v. United States,* 552 U.S.

1

38, 49-50 (2007).  The Guidelines must be properly calculated and considered, but ultimately the Court must craft a sentence that sufficiently accounts for the sentencing factors and objectives outlined in 18 U.S.C. § 3553(a).  *Id.* at 49-50.  Because each case is unique, the Court must make a particularized analysis of the nature and circumstances of the offense and the defendant's history and characteristics. 18 U.S.C. § 3553(a)(1).  The Court must then impose a sentence that sufficiently reflects the seriousness of the crime, promotes respect for the law, and provides just punishment.  18 U.S.C. § 3553(a)(2)(A).  The sentence should adequately deter criminal conduct, protect the public, and provide any necessary education, training or treatment. 18 U.S.C. § 3553(a)(2)(A)-(D).  After determining the appropriate sentence, the Court should adequately explain its rationale to "allow for meaningful appellate review and to promote the perception of fair sentencing."  *Gall,* 552 U.S. at 50.  The Court must also strive to "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  "A sentence is substantively reasonable when the length of the sentence reflects the gravity of the crime and the § 3553(a) factors as applied to the case." *United States v. Martinez-Barragan*, 545 F.3d 894, 905 (10th Cir. 2008).

The government agrees with the advisory sentencing guideline calculation set forth in the final Presentence Investigation Report [#100] ("PSR") filed on December 23, 2015, by U.S. Probation.  As outlined in the Plea Agreement [#85], the parties agree that the adjusted offense level, after taking acceptance of responsibility into consideration, is 29 and that the defendant falls within Criminal History Category VI.  The parties further agree that the resultant advisory sentencing guideline range is 151

months to 188 months imprisonment.

Because the Guidelines are advisory and only one factor to be considered by the Court in determining a sentence under 18 U.S.C. § 3553(a), the United States will frame its request within the factors set forth in 18 U.S.C. § 3553(a), and proceed through those factors in the order in which they appear in the statute.

## II.  DISCUSSION OF THE 18 U.S.C § 3553(a) FACTORS

The factors to be considered under 18 U.S.C. § 3553(a) include the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence to reflect the seriousness of the offense, the need to promote respect for the law and afford adequate deterrence to criminal conduct, the need to protect the public from future crimes of the defendant, and the need to avoid unwarranted sentencing disparities.

### A.     *Nature and Circumstances of the Offense*

The facts of the defendant's crime are well documented here as outlined in the Plea Agreement [#85] ("PA") and in the Presentence Investigation Report [#95] ("PSR"). From August 2012 to October 2012, the defendant chose to sexually exploit two teenage girls, Minor #1 and Minor #2.[1] The defendant arranged for the minors to work as prostitutes in motels in Colorado and Arizona and made a profit from those acts of prostitution.  In short, he manipulated Minor #1 and Minor #2 to commit commercial sex acts so that he could put cold hard cash in his pocket.  The defendant drove the victims from appointment to appointment for his own commercial gain, during which

---

[1] Pseudonyms have been used in this response to protect the identity of minors consistent with the provisions of 18 U.S.C. § 3509(d).

3

appointments the girls were treated as nothing more than commodities for sexual gratification by complete strangers and for the financial gratification of the defendant.

Minor #1 and Minor #2 met through high school.  In early August 2012, the defendant became acquainted with the mother of Minor #2 and then began to live at her home, along with Minor #2 and her four younger siblings.  PA at 12.  Minor #1 started living with Minor #2, her family, and the defendant sometime during the late summer of 2012.  *Id.*

The defendant discussed prostitution with the minors.  He used his phone to take pictures of Minor #1 on more than one occasion in Colorado and Arizona.  *Id.*  In the pictures, Minor #1 was posed in sexual poses in various sorts of attire, including lingerie.  *Id.*  Minor #1 took pictures of Minor #2 posed in sexual poses while partially nude and these photographs were used to advertise the victims' availability for prostitution on a website named "Backpage.com."  PA at 12-13.  The defendant used his Samsung Galaxy SIII cellular telephone to access the Internet and post the images on "Backpage.com," advertising that the minors, who were referred to as NOVA and SUTRA in the ads.  *Id.*  In many of the "Backpage.com" postings, the number for the defendant's Samsung Galaxy SIII cellular telephone was listed as the contact number for the "Johns" who responded to the ads.  PA at 13.  At one point Minor #1 posted ads on "Backpage.com," but she was given a pre-paid credit card either by the defendant or by an adult prostitute associated with the defendant to post the ads.  *Id.*

From September 19, 2012, to approximately October 4, 2012, the defendant transported the minors to various locations in Colorado, including private homes and hotels, so that one or both minors could participate in prostitution.  *Id.*  For example, a

4

male had responded to an Internet advertisement on "Backpage.com" posted the evening of September 19, 2012, advertising "Tasty 2 Girl Treat Featuring Nova & Sexy Sutra-20". *Id.* Both minors engaged in sex acts with the male and received money in exchange for these acts. PA at 13-14. The defendant drove the minors to the male's home and transported them to another location after the commercial sex acts were completed.

In early October, the defendant took the minor victims to Arizona. PA at 14. Advertisements were posted on "Backpage.com" in the Phoenix, Arizona, metropolitan area advertising that the minors were available for prostitution during the time period they were in Arizona. *Id.* Minor #1 engaged in prostitution in Arizona during this time frame. *Id.* The defendant, accompanied by the minors, returned to the State and District of Colorado in the vehicle described above on approximately October 10, 2012. *Id.*

Beginning on or about approximately October 11, 2012, the defendant, Minor #1, and the mother of Minor #2 embarked upon a trip to the Phoenix, Arizona, metropolitan area in a vehicle rented by the mother of Minor #2. *Id.* At least one advertisement was posted on "Backpage.com" in the Phoenix, Arizona, metropolitan area advertising that Minor #1 was available for prostitution during this trip to Arizona. MINOR #1 engaged in prostitution in the Arizona. *Id.*

Meanwhile, an investigation related to the Sex Trafficking of Minors began in Colorado on October 8, 2012, when the mother of Minor #1 (who, at the time, was 16 years old) reported to the police that she was a runaway. PA at 10. The mother of Minor #1 reported that Minor #1 was supposed to be in Arizona with her friend, Minor #

2 (who, at the time, was 17 years old) and Minor # 2's mother. *Id.*

On October 12, 2012, the mother of Minor #1 received phone calls from her daughter #1 and found that MINOR # 1 was using the phone number XXX-XXX-0339. She reported this to the Aurora Police Department. PA at 10-11. It was determined that phone number had been used in numerous escort advertisements. PA at 11. Some of the escort advertisements depicted Minor #1. *Id.* The mother of Minor #1 has filed a Victim Impact Statement. Addendum to the Presentence Report, Exhibit A [#101-1"] ("Addendum to PSR, Exh. A"), p.2. Of these advertisements, she writes "I will never be able to erase the half naked pictures of my daughter on the internet." *Id.*

On October 13, 2012, the mother of Minor #1 received information that she was flying from Arizona to New York and would be at the Phoenix Airport on October 14, 2012. *Id.* The Phoenix Police department responded to the Phoenix airport, located Minor #1, and took her into custody on a runaway warrant. *Id.* When Minor #1 was interviewed by an FBI agent in Phoenix, she did not disclose that she had participated in prostitution. *Id.*

On November 7, 2012, Minor #1 was interviewed in association with this investigation. *Id.* While on that date initially denying that she had engaged in prostitution, she did admit on that and other occasions that she had engaged in prostitution from at least September 19, 2012, to October 12, 2012, in both Colorado and Arizona. *Id.*

On November 9, 2012, Sgt. Dan Steele, of the Denver Police Department, currently assigned to the FBI's Denver Field Office, Rocky Mountain Innocence Lost Task Force, in Denver, Colorado, interviewed Minor #2 in association with this

investigation. *Id.* On that date she admitted that she had engaged in prostitution in September 2012. *Id.* At one point, MINOR #2 recanted her statements of November 9, 2012, but then confirmed that she had recanted due to the negative impact the investigation was having on her family. PA at 11-12.

The investigation, including interviews with the minors, reflects that the defendant received a percentage of the money paid to the minors by the prostitution customers for the commercial sex acts described above. PA at 15. The defendant also bought the minors clothing, bought the minors food, and provided the minors with marijuana during the above-described time period. *Id.*

The relationship between pimps and child victims of prostitution is complex; child victims "frequently fall prey to 'pimps' who lure them in with an offer of food, clothes, attention, friendship, love, and a seemingly safe place to sleep." U.S. Department of Justice, The National Strategy for Child Exploitation Prevention and Interdiction, A Report to Congress, August 2010 ("National Strategy"), at 3, available at http://www.justice.gov/psc/docs/natstrategyreport.pdf (last visited December 23, 2015). In March 2014, a report was released that explored the Underground Commercial Sex Economy in various U.S. cities, including Denver. *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US* Cities, March 2014 ("UCSE"), pp. 86-94, available at http://www.urban.org/research/publication/estimating-size-and-structure-underground-commercial-sex-economy-eight-major-us-cities/view/full_report (last visited December 23, 2015). A lack of self-esteem was in this report, as well, one reason cited as one of the "characteristics of women and girls recruited by pimps." *Id.* at 89-90. This is not a phenomenon that is unique to Denver—

"[p]imps target children who are vulnerable to exploitation, including those with low self-esteem." National Strategy at 31.  A Denver Law Enforcement Official stated "most of these girls, young women you have contact with have pretty low self-esteem.  A lot of people summarize it saying they are missing the father figure…it's not so much the father figure, but they are missing the love, attention, affection that they are not getting."  UCSE at 90.  The law enforcement official went on to say "[the victims] are not getting those needs met and so these pimps understand that they can meet those needs."  *Id.*

The defendant began living under the same roof as the minors in late summer 2012.  It has been amply demonstrated that the defendant was living with both of the girls leading up to the time frame that the crime he pled guilty to occurred; he was therefore perfectly positioned to observe their vulnerabilities.  The stipulation of facts contained in the plea agreement states that the defendant started living at the home of Minor #2 after he met her mother in August 2012 and that Minor #1 began living at the home in late summer 2012.  PA, p. 12.  The defendant himself acknowledged in his interview with law enforcement in November 2012 that he had been living in the residence with Minor #1 and Minor #2.  *Id.* at 15.  The defendant also confirmed this fact in the PSR.  PSR, ¶95.

Within two short months of living with the minors, he was facilitating their commercial sexual exploitation and financially benefitting therefrom, receiving a percentage of the proceeds for each of the commercial sex acts performed by the minor victims.  In this case, while both of the minors had a roof over their heads during the time frame that the defendant victimized them, the defendant was able to manipulate the two minors emotionally due to the instability of their respective home environments.

The defendant provided the victims with marijuana[2], bought clothing for at least one of the minors, bought food for the minors, and checked into and paid for hotel "incidentals"[3] as described above. The defendant must bear responsibility for choosing to exploit the fact that both minors were vulnerable.

While the defendant is not responsible for the reasons that caused Minor #1 to live at her friend Minor #2's home, he facilitated Minor #1's commercial sexual exploitation while knowledgeable that she perceived her home environment to be unstable. As for the susceptibility of Minor #2—the fact that her mother chooses to continue to support a man who commercially sexually exploited her daughter speaks volumes as to the type of environment that Minor #2 was raised in. Despite this, Minor #2 remained loyal to her family--she was so distraught by the impact that she perceived her disclosures of sexual exploitation at the hands of the defendant had on her family that she recanted her statements, later admitting that she had recanted due to the negative impact the investigation was having on her family. PA at 11-12.

Common sense supports that the stress endured by Minor #2 has been great, despite the fact that she still has maintained contact with the defendant, as further described below. Minor #2 felt responsibility for negative impacts on her family during the original investigation. In addition, her mother is now married to the man who commercially sexually exploited her. The defendant's criminal conduct has impacted Minor #1 in myriad ways. The mother of Minor #1 writes that she's noticed a change in her daughter "where it has been difficult for her to have real relationships with anyone,

---

[2] The defendant admitted to smoking marijuana with Minor #1 and Minor #2, but denied supplying it to them. PA at 15.
[3] The defendant admitted to paying for hotel incidentals, but did not admit to paying for the rooms. PA at 15. Documentary evidence reflects that he checked into hotel rooms. PA at 13.

including friends, significant others, and even her own family." Addendum to PSR, Exh. A, p.2.

The government reserves the right to call Sergeant ("Sgt.") Daniel J. Steele, who has been a police officer for 20 years and who is currently assigned to the Denver Police Department's Special Investigation Division and is deputized through the FBI's Innocence Lost Task Force to investigate crimes of human sex trafficking and commercial sexual exploitation of children. Sgt. Steele has been involved in excess of 2,000 prostitution-related arrests. He has conducted interviews of over 200 victims, witnesses, and subject associated with domestic and international sex trafficking, the commercial sexual exploitation of children, and pimping and prostitution-related activities; in addition, he has received and provided extensive education and training in these areas. Sgt. Steele may testify concerning the methods used by pimps in recruiting prostitutes, the different types of pimps, the use of Internet websites, particularly Backpage.com, to post advertisements for prostitutes, the use of gifts, promises, and money to establish a bond with and to obtain control over the prostitute, how pimps find weaknesses in a prostitute and exploit those weaknesses to manipulate the prostitute, how pimps control prostitutes through providing drugs, why prostitutes leave and return to their pimps, why many prostitutes do not self-identify as sex trafficking victims, and why prostitutes often give inconsistent statements to law enforcement about their pimps and willingness to engage in commercial sex acts.

An individualized assessment of the defendant's behavior reflects several aggravating factors. As described at length above, the defendant exploited the vulnerability of two minors whose home environments were less than stable. He plied

them with marijuana, clothing, food, and attention. These factors all reflect the need for a significant prison term. The defendant clearly chose to prioritize financial gain at the expense of the physical and psychological welfare of Minor #1 and Minor #2.

### B. History and Characteristics of the Defendant

The defendant's history and characteristics likewise warrant a substantial sentence. The government acknowledges that the defendant experienced a tumultuous upbringing. PSR, ¶¶ 93-95. However, these childhood tragedies do not explain the actions that are the subject of this prosecution. The defendant has the benefit of having numerous family members and friends who have stood by his side. Defendant's Sentencing Memorandum Exhibit A [#97] (Defendant's Sentencing Memo, Exh. A"), pp. 2-7. Regardless, the defendant has repeatedly chosen to put his own self-interest before the wellbeing of his family by continuing in a pattern of criminal behavior culminating in the sexual exploitation of two minor females for his own commercial gain.

The government is mindful that the defendant, in the eyes of many who wrote letters to this Court, see him as a loyal and reliable family member or friend. The letters written by the defendant's family and friends describe a man capable of generous acts. *Id.* However, defendant showed no compassion or empathy toward the two minor females he subjected to repeated commercial sexual exploitation, potential violence, and disease. Despite the letters' emphasis on the defendant being a great father and that he "has been there for his wife and children and would always put them first and still does;" it is clear that he did not in fact put his then-girlfriend's daughter, Minor #2, first. Defendant's Sentencing Memo, Exh. A, p. 4. He benefitted financially when she had sex with more than one complete stranger, at one point dropping her off so that she could complete a "date" involving both her and Minor #1. PA, pp. 13-14. Additionally,

in terms of one of his own biological children, he is more than $17,000 in arrears in child support payments. PSR, ¶ 97.

According to "Defendant Terrell Smith's Sentencing Memorandum" [#96] ("Defendant's Sentencing Memo"), the defendant is "intelligent" and "friendly." Defendant's Sentencing Memo, p. 13. His mother confirms that he is a "'great" salesman and always did very well at his sales jobs." PSR, ¶127. Frankly, these characteristics are completely consistent with the dynamics of emotional manipulation of victims as described above. In this case, the defendant used his friendliness, intelligence, and sales skills to two convince two minor females to participate in commercial sex for his own financial gain. He made them feel cared for by fulfilling their needs for economic independence and bought them things like marijuana, food, and new clothing. In short, he used his friendliness and business acumen to manipulate the minors and the situation for his financial gain.

To say that the defendant's criminal history is lengthy is a serious understatement. The defendant's criminal history does is not just a string of isolated poor decisions. As evidenced by his tome-like criminal history, the defendant is the embodiment of the career criminal, someone who has spent a good portion of his relatively short life dealing drugs (both crack and marijuana), assaulting others, possessing weapons, and apparently flouting the authority of courts given his repeated efforts to drive while his license was revoked.

The defendant's abhorrent crime in this case was the culmination of a lifetime of lawlessness and amorality. Notwithstanding the defendant's sporadic legitimate employment, in truth he made his living from the misery of other people. He has dealt

drugs, preying on a desperate rung of society, those addicted to drugs. Perhaps tiring of the relative danger of street narcotic sales, the defendant turned to the world of prostitution, where he profited from the commercial sex of two minor girls, among other women. PSR ¶ 24. This is not inconsistent with other offenders involved in prostitution. Denver, Colorado, is one of the cities in which underground commercial sexual exploitation is studies in the UCSE. UCSE at 86-94. According to the study, "[m]ale pimps in Denver tend to have lengthy criminal histories. While men arrested for pimping, pandering, and sex trafficking haven't had direct ties to drug trafficking, they have typically been in prison or jail for drug dealing, gang activity, domestic violence, and assaults." *Id.* at 88. One Denver Law Enforcement Official described the dynamic as a "progression" and described pimping as "a better business" because "[y]ou can control your personnel better." *Id.* It is notable that while drugs and guns end up in evidence safes in law enforcement custody, unable to be manipulated by the offender, minor victims of commercial sexual exploitation are much more easily manipulated pre- or post-arrest. In this case, for example, the defendant spoke with Minor #2 on more than one occasion post-arrest.[4] A redacted excerpt from a report summarizing phone calls made since the defendant's arrest in this case, which was provided to defense counsel in discovery follows:

> On 4/17/14 at 12:20 hours, call to Minor #2: Smith talks to Minor #2 and tells her that he was arrested for pimping her out. Smith tells Minor #2 that he loves her and to tell Minor #1 that he also loves her. Minor #2 tells Smith that she loves him. [The detective] could hear another female, possibly Minor #1, saying that she loves [Smith].

The defendant was not a passive bystander to this crime. While the defendant

---

[4] Minor #2 has indicated that talking to the defendant on the phone was her idea and that she kind of misses him because he was a big part of her life. Hansen Supp. 15, Bates-stamped

13

continues to take responsibility for his criminal acts, the defendant downplays those acts by repeatedly emphasizing the information provided by Minor #2 and corroborated by her mother that the minors were engaged in commercial sexual acts prior to the defendant's commercial sexual exploitation of the girls. Defendant's Sentencing Memo, pp. 8-9. While relevant to the calculation of the sentencing guidelines enhancement for unduly influencing a minor under U.S.S.G. § 2G1.3(b)(2)(B), this assertion does not in any manner provide a defense to the crime to which the defendant pled guilty. In fact, if the assertions are true, the "Victim's Sexual Behavior or Presdisposition" is exactly the type of evidence that Fed. R. Evid. 412 designates may not be introduced at trial with certain exceptions, none of which apply in this case.

For the above reasons, the defendant's history and characteristics merit a significant prison sentence. The defendant, an adult, facilitated the commercial sexual exploitation of two minor victims to whom he had access through his living arrangements, completely disregarding that it is a world marked by disease and potential violence. The defendant sold these two minor victims as chattel on multiple occasions. The reason the criminal statute to which the defendant pled guilty and others like it exist is that minors must be protected from those who would exploit them. In addition, the defendant has an extensive criminal history. For these reasons, a sentence of 188 months imprisonment, at the high end of the guideline range, is entirely appropriate.

> **C.    A term of imprisonment of 188 months addresses the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, for the sentence imposed to afford adequate deterrence to criminal conduct, and to**

---

001913-1914.

> ***protect the public from future crimes of the defendant and additionally addresses the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.***

These factors address the specific containment, deterrent, and otherwise protective effect that the sentence is to have on the defendant and on society as a result. A sentence of 188 months imprisonment accomplishes all of these goals.

> **1. *A sentence that reflects the seriousness of the offense, promotes respect for the law, provides just punishment, and affords adequate deterrence to criminal conduct***

The defendant, in the face of the gravity of the crime here and his lengthy criminal history, simply avers that he "has vowed never to put himself in a position where there is even the possibility he may ever again have to go to jail." Defendant's Sentencing Memo, p. 10. Yet the defendant has given the Court no reason to believe that these statements are anything more than aspirational. The term of imprisonment must be lengthy in order to provide significant deterrence to the defendant and others like him who would cross state lines to exploit minor females by using them as sexual commodities. A sentence of 188 months imprisonment reinforces, to the defendant and to others who are tempted to follow in his footsteps, that this crime is exceedingly grave in nature, thereby promoting respect for the law, providing just punishment, and deterring criminal conduct.

> **2. *A sentence that protects the public from further crimes of the defendant***

The defendant has an established track record of recidivism. He is willing to ignore the law when it serves him. Hence, a significant term of imprisonment, at the high end of the advisory sentencing guideline, is appropriate in this case.

> **3. *A sentence that avoids unwarranted sentence disparities***

> ***among defendants with similar records who have been found guilty of similar conduct.***

It is widely accepted in our jurisprudence that similarly situated individuals that commit like crimes under like circumstances should receive similar punishments.  This congruence fosters predictability and fairness, both for defendants and for the community.  "The [Sentencing Reform Act] was motivated by a desire on the part of Congress to establish a rational sentencing system to provide for certainty, uniformity, and proportionality in criminal sentencing.  The intent of Congress was to eliminate an 'unjustifiably wide range of sentences [imposed on] offenders with similar histories, convicted of similar crimes, committed under similar circumstances,' and to recognize differences between offenses."  *The History of the Child Pornography Guidelines* at 2, *quoting* S.Rep. No. 98-225, at 38, 45-46, available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/sex-offenses/20091030_History_Child_Pornography_Guidelines.pdf (last visited December 23, 2015).

It's the government's position that a sentence within the advisory sentencing guideline range, when it's not unreasonable, minimizes these disparities.  The government contends the advisory sentencing guideline range in this case is reasonable and appropriate in light of the factors set out in 18 U.S.C. § 3553(a).  The facts of this case merit a lengthy prison term.  A sentence of 188 months imprisonment is therefore appropriate and reasonable.

### III.     CONCLUSION

The defendant has participated in a vile and heinous crime—that which exploits our society's children. The defendant chose to put money in his pocket with flagrant

disregard for the physical and psychological welfare of Minor #1 and Minor #2. While he accepts responsibility for the crimes he has committed, it is the government's position that the defendant minimizes the gravity of his criminal conduct.

A sentence of 188 months, at the top of the advisory sentencing guideline range as calculated by the parties and at the bottom of the advisory sentencing guideline range as calculated by U.S. Probation, fairly reflects the factors to be considered under 18 U.S.C. § 3553(a), including the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence to reflect the seriousness of the offense, the need to promote respect for the law and afford adequate deterrence to criminal conduct, the need to protect the public from future crimes of the defendant, and the need to avoid unwarranted sentencing disparities all call for a significant sentence of imprisonment. A sentence of 188 months imprisonment accomplishes these goals.

Respectfully submitted,

JOHN F. WALSH
United States Attorney

By: *s/ Alecia L. Riewerts*
ALECIA L. RIEWERTS
Assistant United States Attorney
United States Attorney's Office
1225 Seventeenth Street, Suite 700
Denver, Colorado 80202
Telephone: (303) 454-0100
Facsimile: (303) 454-0406
Email: Alecia.Riewerts@usdoj.gov
Attorney for Government

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of December, 2015, I electronically filed the foregoing **GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email address:

**Defense Attorney:**
Marc Milavitz

**Email Address:**
altlaw1@comcast.net

By:  *s/ Alecia L. Riewerts*
ALECIA L. RIEWERTS
Assistant United States Attorney
United States Attorney's Office
1225 Seventeenth Street, Suite 700
Denver, Colorado 80202
Telephone: (303) 454-0100
Facsimile: (303) 454-0406
Email: Alecia.Riewerts@usdoj.gov
Attorney for Government